People v Matthews (2018 NY Slip Op 01499)





People v Matthews


2018 NY Slip Op 01499


Decided on March 8, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 8, 2018

106445

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
TYSHEN MATTHEWS, Also Known as TYSHEEN MOORE, Also Known as NITTY, Appellant.

Calendar Date: January 9, 2017

Before: McCarthy, J.P., Egan Jr., Lynch, Clark and Mulvey, JJ.


Thomas F. Garner, Middleburgh, for appellant.
Jason M. Carusone, District Attorney, Lake George (Rebecca Nealon of counsel), for respondent.


Lynch, J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Washington County (McKeighan, J.), rendered January 3, 2014, upon a verdict convicting defendant of the crimes of robbery in the first degree, robbery in the second degree, burglary in the second degree, petit larceny and endangering the welfare of a child.
Defendant, who resided in New York City, sold drugs to three women who resided in the Town of Whitehall, Washington County. When these women began to purchase drugs from another individual, defendant and three codefendants devised a plan to rob the competing drug dealer, who was living at a hotel located in the Town of Hampton, Washington County. During the robbery,
various electronics and crack cocaine were stolen. After the robbery, defendant and the codefendants took a taxicab to the bus station in the City of Albany.
During the ensuing investigation, a witness identified defendant as being involved, and defendant was arrested and charged with robbery in the first degree, robbery in the second degree, burglary in the second degree, petit larceny, conspiracy in the fourth degree and endangering the welfare of a child. Defendant made a pretrial motion to, among other things, challenge the probable cause for his arrest. County Court held a Wade/Huntley hearing, but did not render a decision on this issue. After a jury trial, defendant was convicted of all of the [*2]charges except for conspiracy in the fourth degree. He was sentenced to an aggregate prison term of 20 years to be followed by five years of postrelease supervision. Defendant appealed, and this Court withheld decision and, as relevant here, remitted the matter for a ruling on defendant's probable cause challenge (147 AD3d 1206, 1207 [2017]). Upon remittal, County Court (Michelini, J.) reviewed the transcript of the prior Wade/Huntley hearing and found, among other things, that there was probable cause for defendant's arrest. Defendant has supplemented his appeal to argue that this determination was made in error and that County Court should have conducted a new probable cause hearing.
Initially, we find that the People sufficiently established probable cause for defendant's arrest. At the Huntley/Wade hearing, Officer Daniel J. Stevens testified that a supervising investigator gave him a photograph of defendant and asked him to create a photo array. He created the array, using a database to obtain the photographs of five men with features that were similar to defendant's and presented the array to a woman who had been identified as a witness. According to Stevens, the witness indicated that she recognized defendant and, when asked for the source of her recognition, she answered, "From the trailer in Whitehall that got shot up. He's one of the guys who robbed the Puerto Ricans of their electronics." Jeffrey Horn, an investigator with the State Police, testified that he watched surveillance video taken at the Albany bus station the evening after the robbery and observed defendant and the codefendants handling electronics that were comparable to those reported as stolen from the motel room. It was Horn who, together with other members of the State Police and the Washington County Undersheriff, arrested defendant outside of his home. Horn recalled watching defendant's residence from the street while sitting in an unmarked, gray, Chevrolet Impala police vehicle. Horn described the unmarked vehicle as causing them to "st[ick] out" on the street. Horn watched as defendant came out of his front door and stood on the stoop for a period of time before he noticed the Impala and returned inside. When defendant left the residence the second time, approximately one-half hour later, he was arrested. Horn testified that, prior to the arrest, he was aware that the witness had identified defendant from the photo array.
"Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed or that evidence of a crime may be found in a certain place" (People v Bigelow, 66 NY2d 417, 423 [1985]; see People v McRay, 51 NY2d 594, 602 [1980]). The relevant question is "not . . . defendant's guilt but . . . the sufficiency . . . of the grounds for the arresting officer's belief that the defendant was guilty" (People v Shulman, 6 NY3d 1, 26 [2005] [internal quotation marks, brackets and citation omitted]; see People v Green, 127 AD3d 1473, 1473-1474 [2015], lvs denied 27 NY3d 965, 969 [2016]). Here, a witness identified defendant as one of the people who "robbed the Puerto Ricans of their electronics," and an officer observed defendant with electronics at the bus station the morning after the robbery. Horn was entitled to rely on the information received from a fellow officer with regard to the positive identification (see People v Maldonado, 86 NY2d 631, 635 [1995]). In our view, the evidence demonstrated that there was probable cause for defendant's arrest (see People v Zayas-Torres, 143 AD3d 1176, 1179 [2016]; lv denied 30 NY3d 984 [2017]) and no supplemental hearing was required. We decline to consider defendant's argument that County Court (McKeighan, J.) was required to apply the Aguilar-Spinnelli test to determine whether the witness was reliable because it was not preserved for our review (see People v Wolfe, 103 AD3d 1031, 1034 [2013], lv denied 21 NY3d 1021 [2013]) and, in any event, is without merit because the witness was not a confidential informant but a known member of the community (see People v Zayas-Torres, 143 AD3d at 1179).
We turn next to defendant's arguments that the evidence was not legally sufficient to [*3]support a finding of guilt beyond a reasonable doubt and that the jury's verdict was against the weight of the evidence. "[T]he standard of review in determining whether the evidence before the jury was legally sufficient . . . is whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to conclude that the elements of the crime had been proven beyond a reasonable doubt" (People v Cabey, 85 NY2d 417, 420 [1995]). When determining whether a verdict is against the weight of the evidence, we "first . . . determine whether an acquittal would not have been unreasonable. If so, [we] must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, [we] then decide[] whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d 342, 348 [2007]).
At trial, the jury heard testimony that Nichole Lussier, Jessica Lussier and Angela Lawrence resided together and that all three were addicted to and selling crack cocaine for defendant. Defendant became angry because the women obtained drugs from another supplier, who was residing in a nearby hotel in the area, and together they devised a plan to rob the supplier. Specifically, Lawrence, defendant and three other men would go to the hotel, Lawrence would knock on the door under the guise of seeking more drugs and defendant and the other men would forcibly enter to steal drugs and money. In furtherance of this plan, Jessica Lussier provided a "pellet hand gun" that was "not capable of shooting and killing anybody" and a "little bat," made of wood, known as a tire checker.
Brendaliz Febus testified that she, her father, her boyfriend, Xaymarie Rios and Rios' three children — a seven year old, a four year old and a nine month old — were residing in two hotel rooms. On April 11, 2013, while Febus' father and her boyfriend were out of town — leaving Febus, Rios and the two younger children in one of the two hotel rooms — there was a knock at the door and Febus opened it slightly to find Lawrence, who was looking for one of the two men. Febus recalled seeing shadows, then three men outside with Lawrence. When she tried to shut the door, the group pushed it back open and one of the men "put the gun in [her] face." Febus testified that a fourth man came into the room and that "somebody . . . had like a bat." Rios recalled four men in the room, that one man "had something like a bat" and that a man with a gun was "moving it" and telling Febus to shut up. Febus testified that she yelled at the men to leave, told them repeatedly that she did not have any money or drugs and that she had to pull her shirt down to prove that she was not hiding anything. After staying for approximately 15 minutes, the men left, taking two video gaming systems, some jewelry, cellular phones, four pieces of crack and a bag of change with them. The group returned to the residence shared by the Lussiers and Lawrence, and the four men left after finding a taxicab to take them to the bus station in Albany. An investigator with the State Police testified that he obtained a plastic "BB [or] pellet" gun and a "baton" from Lawrence's residence.
As relevant here, a person commits robbery in the first degree "when he [or she] forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he [or she] or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument" (Penal Law § 160.15 [3]), and a person commits robbery in the second degree "when he [or she] forcibly steals property and when . . . [h]e [or she] is aided by another person actually present" (Penal Law § 160.10 [1]). A person commits burglary in the second degree "when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when [t]he building is a dwelling" (Penal Law § 140.25 [2]). A person commits petit larceny when he or she "steals property" (Penal Law § 155.25). The crime of endangering the welfare of a child is supported with proof that a person "knowingly act[ed] in a manner likely to be injurious to the physical, mental, or moral welfare of a child less [*4]than 17 years of age" (Penal Law § 260.10 [1]).
Further, a "dangerous instrument" is "any instrument, article or substance . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [13]). A "serious physical injury" is a "physical injury which creates a substantial risk of death
. . . or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). There is no "absolute definition of the term" dangerous instrument, nor is there "a list of items which can be considered dangerous instruments" (People v Carter, 53 NY2d 113, 116 [1981]). Whether an item is a dangerous instrument depends on the way that it is used (see id.), and the item's capacity to cause serious physical injury must be proven, not inferred (see People v Hall, 18 NY3d 122, 129 [2011]).
The evidence in the record, viewed in the light most favorable to the People, was not legally sufficient to support the robbery in the first degree charge (count 1). Indisputably, the "gun" was plastic and did not work, and there was no evidence that it could potentially harm someone (see People v Wilson, 252 AD2d 241, 249 [1998], lv denied 93 NY2d 859 [1999]; compare People v Perez, 93 AD3d 1032, 1035 [2012], lvs denied 19 NY3d 1000 [2012]). Similarly, while there was testimony that one of the men entering the motel room was holding the tire checker, there was no evidence that any individual brandished the tire checker in a threatening manner (see People v Mason, 84 AD3d 1502, 1503 [2011]). Here, as in People v Mason (supra), there is no question that one of the individuals possessed a dangerous instrument. What was missing was any evidence that there was any verbal threat of immediate use of the instrument or that it was "employ[ed]" in any way (People v Pena, 50 NY2d 400, 407 n 2 [1980], cert denied 449 US 1087 [1981]; see People v Mason, 84 AD3d at 1503). Accordingly, count 1 of the indictment must be dismissed. We find that the verdict as to the remaining charges is supported by legally sufficient evidence and, further, is in accord with the weight of the evidence.
We turn next to defendant's claim that County Court erred in denying trial counsel's motion to withdraw as counsel. In general, "[w]hether counsel is substituted is within the discretion and responsibility of the trial judge" (People v Porto, 16 NY3d 93, 99 [2010] [internal quotation marks and citation omitted]). The trial court has a duty to consider a motion to withdraw where there is a "seemingly serious request" — that is — one based on "specific factual allegations of serious complaints" (id. at 99-100). Although a request should "not be used merely to delay the orderly administration of justice," where there are such allegations, the court may not summarily deny a request, but must instead make at least a "minimal inquiry" to determine whether there is good cause to substitute counsel (People v Sides, 75 NY2d 822, 824-825 [1990]; see People v Gibson, 126 AD3d 1300, 1301-1302 [2015]). The "minimal inquiry" is necessary for the court to "discern meritorious complaints from disingenuous applications by inquiring as to the nature of the disagreement or its potential for resolution" (People v Porto, 16 NY3d at 100 [internal quotation marks and citation omitted]). "In determining whether good cause exists, a trial court must consider the timing of the defendant's request, its effect on the progress of the case and whether present counsel will likely provide the defendant with meaningful assistance" (id. at 100 [internal quotation marks and citation omitted]).
Defendant's trial counsel was assigned to represent defendant in June 2013. At an appearance on October 18, 2013, County Court scheduled defendant's trial to begin on December 2, 2013. By motion dated November 13, 2013, trial counsel sought to withdraw because "the attorney/client relationship ha[d] continually deteriorated so as to fatally impact" his ability to represent defendant. In support of this claim, trial counsel complained that defendant (1) filed motions without notice to trial counsel at the same time that trial counsel was [*5]completing and filing pretrial motions on defendant's behalf, (2) refused to review the Huntley/Wade rulings, (3) refused to listen, shouted at trial counsel and/or threatened to report "everybody" and replace him as counsel each time that he went to the correctional facility to discuss the case, and (4) filed a formal complaint against trial counsel. In sum, trial counsel explained that he was no longer able to "adequately and zealously represent" defendant's interests "due to the irretrievable breakdown in the attorney/client relationship." In opposing the motion, the People encouraged the court to advise defendant that he is not allowed to select assigned counsel and that counsel decides on trial strategy. By written decision dated November 19, 2013, County Court denied the motion, pointing out that if the motion were granted, the trial would not begin until "early next year." Further, the court reasoned that, in its view, defendant's formal complaint was meritless, trial counsel's pretrial representation had been "effective[ ]" and defendant had made "many complaints" about all involved.
We find that, on this record, defendant's right to counsel was not adequately protected. County Court's determination focused on the inconveniences that would result if counsel were substituted and the trial were delayed one month, as well as defendant's propensity to complain. But it was trial counsel, not defendant, complaining that the relationship had broken down, and the request was not made on the eve of trial. While we are not suggesting that a request made by counsel warrants heightened inquiry, "a conflict of interest or other irreconcilable conflict with counsel" may constitute good cause for substitution (People v Sides, 75 NY2d at 824; see People v Washington, 25 NY3d 1091, 1095 [2015]; People v Smith, 18 NY3d 588, 592-593 [2012]), and there was no inquiry here to assess the gravity of counsel's concerns in this regard. The motion raised specific examples to support trial counsel's claim that there was "an irretrievable breakdown" in the relationship with defendant. As such, the court should have first questioned both defendant and trial counsel about "the nature of the disagreement or its potential for resolution" prior to denying the motion (People v Sides, 75 NY2d at 825; see People v Gibson, 126 AD3d at 1302). Absent such a "minimal inquiry," we are compelled to reverse the judgment of conviction (see People v Smith, 30 NY3d 1043, 1044 [2017]; compare People v Brown, 154 AD3d 1004, 1006 [2017]). Therefore, we remit this matter for the assignment of counsel and for further proceedings on the remaining counts of the indictment.
Defendant's remaining contentions are academic given our reversal of the judgment of conviction.
McCarthy, J.P., Clark and Mulvey, JJ., concur.




Egan Jr., J. (concurring in part and dissenting in part).


I agree with the majority that the People established sufficient probable cause for defendant's arrest, that there was legally sufficient evidence presented with regard to defendant's convictions for robbery in the second degree, burglary in the second degree, petit larceny and endangering the welfare of a child and that County Court failed to adequately protect defendant's right to counsel such that reversal of the judgment of conviction and remittal for further proceedings is appropriate under the circumstances. However, because I find that there was legally sufficient evidence presented from which the jury could have concluded that the display of a tire checker or bat during the commission of the subject robbery constituted the threatened use of a dangerous instrument sufficient to support a conviction for robbery in the first degree, I respectfully dissent from that part of the majority decision dismissing count 1 of the indictment.
Contrary to the majority's holding, I do not believe that there is a strict requirement that [*6]a dangerous instrument, such as the tire checker or bat at issue (see Penal Law § 10.00 [13]; cf. People v Johnson, 63 AD3d 470, 470 [2009], lv denied 13 NY3d 745 [2009]), needs to actually be brandished in a threatening manner, as opposed to being displayed, during the course of a robbery in order to support a conviction for robbery in the first degree (see People v Tejada, ___ AD3d ___, ___, 2018 NY Slip Op 00801, *1 [2018] [robbery in the first degree conviction upheld where there was no reasonable explanation for the defendant's display of a dangerous instrument during robbery other than an implied threat to use it]; People v Sharma, 112 AD3d 494, 495 [2013], lv denied 23 NY3d 1025 [2014] [robbery in the first degree conviction upheld where the display of a dangerous instrument, coupled with the surrounding circumstances, satisfied the threatened use element of Penal Law § 160.15 (3)]; People v Boisseau, 33 AD3d 568, 568 [2006], lv denied 8 NY3d 844 [2007] [robbery in the first degree conviction upheld where there was no innocent explanation for the fact that the defendant displayed a dangerous instrument during a robbery]). The evidence at trial established that defendant, Angela Lawrence and three other men concocted a plan to force their way into the victims' hotel room for the purpose of robbing the occupants thereof of any drugs and money contained therein. Lawrence testified that the group brought with them a pellet gun and tire checker because "when the guys went in . . . they wanted something to be able to use force to take whatever [the victims] had." Lawrence's girlfriend, Jessica Lussier, who was present during the planning of the robbery, testified that the pellet gun and tire checker were brought along "[f]or protection . . . [;t]hey were going to rob them." Two of the victims inside the hotel room testified that they observed one of the intruders holding a bat while demanding to know where the drugs and money were located (compare People v Mason, 84 AD3d 1502, 1504 [2011] [wherein neither witness actually observed the defendant in possession of a dangerous instrument]). This was no social call — it was an armed, forced entry into a hotel room in the nighttime. It is my view that the jury, having viewed the tire checker in evidence and considered the testimony as to why it was brought along, was presented with legally sufficient evidence from which it could conclude that defendant was armed with and threatened the use of a dangerous instrument (see Penal Law § 160.15 [3]; People v Tejada, 2018 NY Slip Op 00801 at *1; People v Sharma, 112 AD3d at 495; People v Boisseau, 33 AD3d at 568; People v Thompson, 273 AD2d 153, 153 [2000], lv denied 95 NY2d 908 [2000]; People v Marcano, 248 AD2d 157, 158 [1998], lv denied 91 NY2d 1009 [1998]).
ORDERED that the judgment is reversed, on the law, count 1 of the indictment dismissed, and matter remitted to the County Court of Washington County for further proceedings not inconsistent with this Court's decision.